IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE

Assigned on Briefs November 14, 2017

**STATE OF TENNESSEE v. ERIC JAMES LEWIS BOGLE**

**Appeal from the Circuit Court for Marshall County**
**No. 16-CR-7    Franklin Lee Russell, Judge**

_____

**No. M2016-02284-CCA-R3-CD**

_____

A Marshall County Circuit Court Jury convicted the Appellant, Eric James Lewis Bogle, of rape of a child, a Class A felony, and the trial court sentenced him to thirty-five years in confinement to be served at 100%. On appeal, the Appellant contends that the trial court erred by denying his motion to suppress his statement to police because he invoked his right to counsel and that the evidence is insufficient to support his conviction without his statement. Based upon the record and the parties' briefs, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ALAN E. GLENN, JJ., joined.

Matthew D. Wilson, Spring Hill, Tennessee, for the appellant, Eric James Lewis Bogle.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Counsel; Robert James Carter, District Attorney General; and Weakley Edward Barnard and Felicia Walkup, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

At trial, the victim's father testified that he had been married to the victim's mother and that they had two children:  the victim and the victim's sister. At some point, the victim's parents divorced. The two children lived with their mother in Jackson but visited their father every summer. In July 2015, the victim's father was remarried and living in West Memphis, Arkansas. About July 13, the victim, who was seven years old,

and his sister, who was ten years old, arrived at their father's home for their annual summer visitation. On July 16, the victim's father learned something about the victim from his wife, the victim's stepmother. Based on what his wife told him, the victim's father spoke with the victim. The victim's father said that the victim was scared and reluctant to speak with him at first but that the victim ultimately told him something that made him feel hurt and angry. The victim's father immediately contacted the Arkansas Department of Human Services, which put him in contact with the Department of Human Services in Jackson, Tennessee.

On cross-examination, the victim's father testified that when he spoke with the victim on July 16, he asked the victim only one question. He stated that prior to his speaking with the victim, he had not had any custody disputes with the victim's mother and that he currently was not in a custody dispute with her. He said that he was not planning to seek custody of the victim and that he did not have any problem with the victim's mother having custody of the victim.

The victim testified that he was eight years old. When the victim was seven years old, the Appellant was married to the victim's mother, and the family lived in Jackson. Sometimes, the victim stayed with the Appellant at the Appellant's grandmother's house in Petersburg, Tennessee. The Appellant's mother and grandmother lived in the home, and the victim watched television and jumped on the trampoline during the visits. The victim said that when he took a shower at home in Jackson, he showered by himself. However, when he stayed overnight with the Appellant in Petersburg, the Appellant washed the victim in the shower even though the victim did not need any help. The Appellant had his own bedroom, and the victim slept with the Appellant in the Appellant's bed.

The victim testified that on one occasion, the Appellant, who was lying on his back on the bed, told the victim to take off his pajamas and get on top of him. The victim did as he was told and sat on the Appellant. The victim said that the Appellant "raised up," put his mouth on the victim's penis, and sucked the victim's penis. Afterward, the Appellant told the victim not to tell anyone. The victim put his pajamas back on and went to sleep.

On cross-examination, the victim testified that his father was the first person he told about the incident. His father asked how the incident happened but did not ask him any other questions. Defense counsel asked the victim, "[H]ave you ever seen anybody else put their mouth on someone else's penis?" The victim answered, "I seen my dad and my stepmom." Defense counsel then asked if anyone else had ever put his or her mouth on the victim's penis, and the victim said that a male classmate had put his mouth on the victim's penis.

The victim's mother testified that she used to live in Jackson with her children. The victim's mother met the Appellant on a dating website, and they exchanged telephone numbers. The Appellant lived at his grandmother's house in Petersburg, and the victim's mother met him in person for the first time in May 2014. The victim's mother and the Appellant took a trip to Branson, Missouri, and the Appellant met her children when they returned from the trip. The Appellant interacted with the children, and the children trusted him and had a good relationship with him.

The victim's mother testified that she and the Appellant became engaged in December 2014 and that she and the children stayed with the Appellant sometimes at his grandmother's house. The victim's mother and the Appellant were not married, so the victim's mother and the children slept in the guest bedroom while the Appellant slept in his bedroom. Sometimes, though, the victim slept with the Appellant in the Appellant's room. The victim's mother said she never had any concerns about the victim's sleeping with the Appellant.

The victim's mother testified that at some point, the Appellant approached her about him and the victim going on a church trip to an aquarium. The Appellant "thought that it would be good for [the victim] to go," and the victim's mother agreed. The Appellant and the victim went on the trip the first week of June 2015, and they stayed at the Appellant's grandmother's house during the trip. The victim's mother remained in Jackson. When the victim returned home from the trip, he did not say anything bad had happened with the Appellant. The victim's mother married the Appellant on June 27, 2015.

The victim's mother testified that after she married the Appellant, he lived with her and the children in Jackson. In July 2015, the children went to visit their father in Arkansas. On July 16, the victim's mother received a telephone call from the Department of Children's Services. After the call, the victim's mother told the Appellant, "Eric, I just got a phone call saying that there were allegations that my son had been molested by you." She said the Appellant's only response was that "[t]hey will believe a child before they believe an adult." The victim's mother immediately left for Arkansas, her relationship with the Appellant ended, and the Appellant moved back into his grandmother's house. The victim's mother was not allowed to be around her children from July 16 until July 29. In order to get her children back, she had to take certain steps, including obtaining an order of protection against the Appellant.

The victim's mother testified that the victim's father never expressed any concern about her marrying the Appellant. She acknowledged that she was aware the victim may have been sexually abused by a classmate but said that she was unaware the victim may

have witnessed sexual activity in his father's home. She said that between the time the victim returned from the church trip and she married the Appellant, she noticed "a couple of changes" in the victim's behavior when he was around the Appellant. However, if she had ever noticed anything concerning, she would not have married the Appellant. At her and the Appellant's wedding, the victim defecated on himself while the family was taking pictures. The victim's mother said the victim's "accident" was not normal. At the time of the trial, she and the Appellant were still married because she could not afford a divorce.

Detective Drew Binkley of the Marshall County Sheriff's Office (MCSO) testified that on October 13, 2015, he and Detective Charles Bass went to a home in Petersburg to try to speak with the Appellant about some allegations against him. They talked with the Appellant in the living room. The detectives read the Appellant's Miranda rights to him, and he signed a waiver of rights form. The Appellant began giving his statement at 4:29 p.m., and he signed his statement at 5:22 p.m. Detective Binkley read the Appellant's statement to the jury as follows:

> [The victim] stayed at my house . . . for the first or second week of June for a week. During this week, we would take showers together. He would wash himself and get out and dry off while I washed myself. He never made any comments about my nor his genitalia during these showers.

> One night, we were laying in our bed watching TV and [the victim] said something about his dad and stepmom and what he said he saw. He said he saw her giving oral sex to his dad. Then he talked about a boy putting his mouth on [the victim's] penis. He then stated, or started asking me to do that, but I kept telling him, No, that I was not going to do that. He took his pajama pants off under the covers, then jumped up and put his penis in my mouth. I pushed him off and told him, No. He stated that felt good, Mr. Eric. That was what, that was what that boy did to me in school.

> I didn't tell anyone, because I was afraid of what he would think.

On cross-examination, Detective Binkley testified that in the first part of September 2015, he contacted the Appellant, and the Appellant agreed to come to the police department the next day to speak with the detectives. The next day, though, the Appellant "contacted the Sheriff's Office and stated that he had contacted an attorney."

- 4 -

The Appellant provided the attorney's name to the sheriff's office. More than one month later, Detective Binkley spoke with the attorney, and the attorney denied having been contacted by the Appellant. On October 13, Detectives Binkley and Bass went to the Appellant's home to ask him questions. They knocked on the door, and the Appellant "invited" them inside. Detective Binkley said he did not hear the Appellant say something to the effect of "I don't know if I should let you [in]."

Detective Binkley testified that Detective Bass wrote the Appellant's statement. Detective Binkley explained that Detective Bass would write one or two sentences, that Detective Bass would read the sentences back to the Appellant, and that the Appellant would say, "Yes, that's correct." Detective Binkley acknowledged that Detective Bass did not write down everything the Appellant said. Detective Binkley stated, "[T]here was a few things that wasn't put in there, but it was basically where he would say that nothing ever happened. He would deny every part of it." The officers did not video-record the Appellant's statement.

On redirect examination, Detective Binkley testified that prior to giving his statement, the Appellant advised them that he recently had foot surgery and was taking hydrocodone. The Appellant did not appear to be under the influence of drugs or alcohol. After the Appellant gave his statement, the Appellant read it to himself and signed it. At the conclusion of Detective Binkley's testimony, the State rested its case.

The Appellant recalled the victim's father to the stand. The victim's father testified that he had never had sexual relations with the victim's stepmother in front of the victim and that he had never touched the victim inappropriately. He denied "coach[ing]" the victim.

The jury convicted the Appellant as charged of rape of a child, a Class A felony. After a sentencing hearing, the trial court ordered that he serve thirty-five years in confinement at 100%.

## A. Motion to Suppress

The Appellant contends that the trial court erred by failing to suppress his October 13 statement because the detectives conducted a custodial interrogation even though he had invoked his right to counsel on the telephone on September 9. The State argues that the trial court properly denied the motion. We agree with the State.

Before trial, the Appellant filed a motion to suppress his statement, arguing that he did not give his statement knowingly or intelligently on October 13 because he was on pain medication. At the suppression hearing, Julia Ellen Porter, the Appellant's

grandmother, testified for the Appellant that in October 2015, he lived with her in Petersburg. The Appellant had surgery on his ankle and was taking pain medication. On October 13, the police came to Ms. Porter's house. She stated, "They talked to him, and then they come to arrest him, and they took him out on the porch and talked to him. . . . They took him then, they took him away then."

On cross-examination, Ms. Porter testified that the officers rang the doorbell sometime after lunch and that the Appellant answered the door. The officers were wearing uniforms and came to the house only one time that day. They put handcuffs on the Appellant, and Ms. Porter asked if they were going to arrest him. The officers said yes. The Appellant's aunt also was present at the home and asked why the police were arresting the Appellant. The officers responded that they had a warrant for the Appellant's arrest. Ms. Porter said that the Appellant's surgery occurred about two months before his arrest and that he was wearing a "boot" on October 13.

The Appellant called Detective Steven Chadwick Bass to the stand. Detective Bass testified that in October 2015, he was a detective with the MCSO. On October 13, Detective Bass and Detective Binkley went to the Appellant's home. They were in uniform, and their guns and badges were visible. They knocked on the door, and the Appellant answered. Detective Bass asked if they could come in, and the Appellant allowed them inside. The Appellant was wearing a foot brace and advised the detectives that he had recently had foot surgery and was taking hydrocodone for pain. Detective Bass filled out a waiver of rights form for the Appellant, and Detective Bass acknowledged that he wrote "hydrocortisone" instead of "hydrocodone" on the form. He said, "That was a mistake on my part." The Appellant told the detectives that he had not taken the medication since "[l]ast night."

Detective Bass testified that he read the Appellant's rights to the Appellant and that he explained to the Appellant "exactly what they meant." He and Detective Binkley then took the Appellant's statement. Detective Bass acknowledged that the Appellant was free to leave but that he never asked the Appellant if the Appellant wanted them to leave. Detective Bass said that "[i]f he [had] wanted us to leave, we would have left" and that "I made sure he understood what his rights were and that he didn't have to talk to us if he didn't want to."

On cross-examination, Detective Bass testified that on September 8, 2015, he and Detective Binkley went to the Appellant's residence and "made contact with him at the front door." Detective Bass "requested" that the Appellant come to the sheriff's office the next day to give a statement, and the Appellant "was agreeable to that, and he said he would be there." The Appellant was not in custody, they did not arrest him, and they left. The next day, the Appellant contacted Detective Bass by telephone and said he was not

- 6 -

coming to the sheriff's office because he wanted to talk with an attorney. The detectives never heard from the Appellant or an attorney, so they returned to his house on October 13.

Detective Bass testified that he did not remember if the Appellant or the Appellant's mother answered the door. Detective Bass introduced himself and asked if the Appellant would like to talk with them. The Appellant responded that "he wasn't sure but to come in and sit down and we would talk about it." The detectives went into the living room. The Appellant and Detective Bass sat down, and Detective Binkley leaned against a wall. Detective Bass never told the Appellant that he was under arrest. Detective Bass read Miranda rights and the waiver of rights form to the Appellant. Detective Bass explained the waiver form, handed the form to the Appellant, and asked the Appellant to read aloud any line he wanted to read. The Appellant read aloud his right to remain silent. The Appellant said he would talk to Detective Bass, and Detective Bass told the Appellant that the Appellant would have to sign the form. The Appellant signed the form, and Detective Bass filled in the date, October 13, and the time, 4:29 p.m. Both detectives also signed the form.

Detective Bass testified that the Appellant said he could read and write and that he had "[s]ome college" education. The Appellant stated that he was under a doctor's care for foot surgery and was taking hydrocodone but that he had not taken the medicine since the previous night. Detective Bass estimated that the Appellant had not taken the medication for at least twelve hours, and the Appellant did not appear to be under the influence of any substance. The Appellant's grandmother and another woman were present. Detective Bass thought the woman was the Appellant's mother, but he acknowledged that she could have been the Appellant's aunt.

Detective Bass testified that he did not consider the Appellant to be in custody and that he would have left if the Appellant had told him to do so. After the Appellant gave his statement, he reviewed it. He signed and dated the statement at 5:22 p.m. Detective Bass thanked the Appellant for his time, and he and Detective Binkley left and returned to the sheriff's office. Detective Bass obtained a warrant for the Appellant's arrest, and he and a deputy returned to the Appellant's home. The Appellant was outside, and the officers handcuffed him and took him into custody. Detective Bass estimated that one and one-half to two hours had elapsed between the time he left after obtaining the Appellant's statement and his return to arrest the Appellant.

On redirect examination, Detective Bass denied speaking with the Appellant by telephone on September 8. He acknowledged that on September 9, the Appellant told him that the Appellant needed an attorney. Detective Bass did not speak with the Appellant again until October 13. On that day, Detective Bass went to the Appellant's

home to see if the Appellant would talk with him and asked the Appellant to waive his right to counsel. He acknowledged that without the Appellant's statement, he would not have obtained an arrest warrant for the Appellant on October 13.

Detective Binkley testified for the State that on September 8, 2015, he and Detective Bass went to the Appellant's home. Detective Bass knocked on the door and asked if the Appellant wanted to come to the sheriff's office for an interview. The Appellant said he would, and the detectives left. The Appellant was supposed to come to the sheriff's office the next day.

Detective Binkley testified that on October 13, they returned to the Appellant's house and knocked on the door. Detective Bass spoke with the Appellant. The Appellant said he would talk with them and invited them in the house. They went into the living room, and the Appellant and Detective Bass sat down while Detective Binkley stood by the door. Detective Bass went over the Appellant's rights with the Appellant and explained them to the Appellant, and the Appellant waived his rights. Detective Bass talked with the Appellant about the allegations, and the Appellant gave a statement. The detectives left, and Detective Binkley did not return with Detective Bass to arrest the Appellant.

On cross-examination, Detective Binkley testified that he did not have any contact with the Appellant between September 9 and October 13. Although the Appellant never contacted Detective Binkley during that time, he may have contacted Detective Bass.

At the conclusion of the hearing, defense counsel argued that the Appellant's October 13 statement was involuntary due to "a very strong opiate he took the night before." Defense counsel also argued that based on Detective Bass's surprising cross-examination testimony, "Detective Bass resumed the interrogation after the [Appellant] had invoked his right to counsel" on September 9. Defense counsel requested that he be allowed to amend his motion to suppress to include the new issue. The trial court immediately ruled that the evidence did not show the Appellant was under the influence of pain medication when he gave his statement and gave counsel one week to submit a brief on whether the Appellant requested an attorney prior to a custodial interrogation. Subsequently, defense counsel filed a brief in which he argued that the Petitioner invoked his Fifth Amendment right to counsel on September 9 and that the detectives violated that right by questioning him without counsel present on October 13. Defense counsel asserted that the detectives conducted a custodial interrogation on October 13 because the officers were in uniform with their badges and guns visible and because they read the Appellant his Miranda rights. In a written order, the trial court ruled that the interrogation on October 13 was noncustodial and denied the Appellant's motion to suppress. On appeal, the Appellant maintains that he invoked his right to counsel on

September 9. He also maintains that by going to his home unannounced and questioning him, the detectives violated that right on October 13.

In reviewing a trial court's determinations regarding a suppression hearing, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Accordingly, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." Id. Nevertheless, appellate courts will review the trial court's application of law to the facts purely de novo. See State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001). Furthermore, the State, as the prevailing party, is "entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." Odom, 928 S.W.2d at 23. Moreover, we note that "in evaluating the correctness of a trial court's ruling on a pretrial motion to suppress, appellate courts may consider the proof adduced both at the suppression hearing and at trial." State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998).

The Fifth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution generally provide to individuals accused of criminal activity a privilege against self-incrimination; therefore, we must examine the voluntariness of statements taken during custodial interrogation. State v. Callahan, 979 S.W.2d 577, 581 (Tenn. 1998). In Miranda v. Arizona, 384 U.S. 436, 444 (1966), the United States Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." These procedural safeguards require that police officers must advise a defendant of his or her right to remain silent and of his or her right to counsel before they may initiate custodial interrogation. State v. Sawyer, 156 S.W.3d 531, 533 (Tenn. 2005). The right to counsel applies "whenever a suspect requests that counsel be present during police-initiated custodial interrogation. State v. Saylor, 117 S.W.3d 239, 244 (Tenn. 2003). "Custodial" means that the subject of questioning is in "custody or otherwise deprived of his freedom by the authorities in any significant way." Miranda, 384 U.S. at 478. Upon a suspect's unequivocal request for an attorney, police must cease all interrogation unless the suspect initiates further communication. See Edwards v. Arizona, 451 U.S. 477, 484-85 (1981); State v. Stephenson, 878 S.W.2d 530, 545 (Tenn. 1994).

Turning to the instant case, the detectives went to the Appellant's home on September 8, 2015, and requested that he come to the sheriff's office on September 9 to give a statement. The Appellant said he would. The next day, though, he telephoned Detective Bass and told the officer that he was not coming to give a statement because he

had contacted an attorney. Although the Appellant claims that he invoked his Fifth Amendment right to counsel on September 9, the Appellant's right to counsel was not implicated because he did not make an unequivocal request for counsel during a police-initiated custodial interrogation.

In any event, the detectives waited for more than one month to hear from either the Appellant or his attorney. Tired of waiting, they contacted the attorney and learned that he had never spoken with the Appellant. Therefore, the detectives returned to the Appellant's home on October 13 and again asked if he would give a statement. The Appellant was not under arrest, and the detectives would have left if he had asked them to leave. Instead, the Appellant invited them into his home. The detectives advised the Appellant of his Miranda rights even though they were under no obligation to do so, and the Appellant waived those rights. He never requested an attorney, and he gave a statement. Accordingly, we conclude that the trial court properly denied the Appellant's motion to suppress.

## B. Sufficiency of the Evidence

The Appellant contends that without his statement, the evidence is insufficient to support his conviction. The Appellant notes that the victim's claim that he saw his stepmother engaged in oral sex with his father was contrary to the testimony of the victim's father; therefore, if the victim was lying about seeing his father and stepmother engaged in oral sex, he could have been lying about putting his penis in the Appellant's mouth. However, we have already determined that the trial court properly allowed the Appellant's statement into evidence. Regardless, we find no merit to this claim.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. Id. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the

burden of demonstrating to this court that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

A guilty verdict can be based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting Marable v. State, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)).

Relevant to this case, rape of a child is defined as the "unlawful sexual penetration of . . . the defendant by a victim . . . if the victim is more than three (3) years of age but less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-522(a). "'Sexual penetration' means sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." Tenn. Code Ann. § 39-13-501(7).

The victim testified that he and the Appellant occasionally spent the night at the Appellant's grandmother's house and that during those visits, he slept with the Appellant in the Appellant's bed. The victim said that on one occasion when his mother was not there, the Appellant told him to take off his pajamas and get on top of him. The victim stated that he did as he was told and that the Appellant "raised up" and put the victim's penis in the Appellant's mouth. The victim's mother confirmed that the victim sometimes slept with the Appellant at the Appellant's grandmother's house and said that the Appellant and the victim stayed at the Appellant's grandmother's house during a church trip in early June 2015. She also said the victim's behavior around the Appellant changed after the trip. When the victim's mother confronted the Appellant about molesting the victim, the Appellant did not deny the allegations. We conclude that the evidence is sufficient to support the Appellant's conviction, with or without his statement to the detectives.

- 11 -

### III.  Conclusion

Based upon the record and the parties' briefs, we affirm the judgment of the trial court.

_____
NORMA MCGEE OGLE, JUDGE